LEONARD v. LENNOX.

(Circuit Court of Appeals, Eighth Circuit. September 21, 1910.)

No. 2,721.

(Syllabus by the Court.)

1. PUBLIC LANDS (§ 110*)—ESSENTIALS OF RIGHT TO PATENT.

To entitle one to a patent under the public land laws it is essential, among other things, that he comply with all the requirements of the statute under which he seeks the title and the authoritative regulations of the Land Department thereunder.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 308, 309; Dec. Dig. § 110.*]

2. PUBLIC LANDS (§ 110*)—RIGHT TO PATENT AS AFFECTED BY MINERAL CHARACTER OF LAND—TIME TO WHICH INQUIRY MUST BE DIRECTED.

When the right to a patent under such a law as the soldier's additional homestead law depends upon whether the land is agricultural or is known to be chiefly valuable for coal, that question must be determined according to the conditions existing at the time when the applicant complies with all the requirements of the statute and the authoritative regulations. If at that time the land is not known to be chiefly valuable for coal, he acquires a right to a patent which will not be disturbed by a subsequent change in the conditions; but, if before such compliance it is discovered that the land is thus valuable for coal, nothing that he subsequently may do will give him a right to a patent, because land known to be of that character is not subject to acquisition under such a law, but only under the coal land law.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 308; Dec. Dig. § 110.*]

3. EVIDENCE (§ 47*)—REGULATIONS OF LAND DEPARTMENT—JUDICIAL NOTICE.

Courts take judicial notice of the regulations of the Land Department, and when required to pass upon the existence of a particular regulation, as when ascertaining any other fact of which they take judicial notice, may resort to any source of information which in its nature is calculated to be trustworthy and helpful, always seeking first for that which is most appropriate.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 69; Dec. Dig. § 47.*]

4. PUBLIC LANDS (§ 97*)—LAND DEPARTMENT—POWER TO PRESCRIBE REGULATIONS.

The Commissioner of the General Land Office and the Secretary of the Interior, although powerless to adopt a regulation which is in any wise inconsistent with, or repugnant to, the public land laws, are empowered to enforce, by appropriate regulations, every part of those laws, as to which it is not otherwise specially provided.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 288, 289; Dec. Dig. § 97.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**5. Public Lands (§ 98*)—Regulation Requiring Nonsaline Showing.**

The regulation of the Land Department prescribed November 19, 1901, requiring applicants under the nonmineral laws to support their applications by a showing that the land applied for is nonsaline, is a valid regulation, and an applicant under the soldier's additional homestead law does not do all that he is required to do to entitle him to a patent until he complies with that regulation.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 290; Dec. Dig. § 98.*]

Appeal from the Circuit Court of the United States for the District of Colorado.

Bill by William Lennox against John C. Leonard. Decree for plaintiff, and defendant appeals. Reversed, with directions.

William V. Hodges (Clayton C. Dorsey, A. A. Hoehling, Jr., and C. W. Darrow, on the brief), for appellant.

Joseph C. Helm and John R. Dixon (C. A. Roberts, on the brief), for appellee.

Before SANBORN and VAN DEVANTER, Circuit Judges, and WILLIAM H. MUNGER, District Judge.

VAN DEVANTER, Circuit Judge. Under a patent from the United States issued to him under the coal land law (Rev. St. § 2347 et seq. [U. S. Comp. St. 1901, p. 1440]), the appellant holds the title to a parcel of land in Colorado which the appellee insists should have been patented to him under the soldier's additional homestead law (Rev. St. § 2306 [U. S. Comp. St. 1901, p. 1415]), and would have been so patented but for a material error of law committed by the Land Department in a contest between the appellant and the appellee relating to the character of the land.

Public lands known to be chiefly valuable for their deposits of coal are not subject to acquisition under the soldier's additional homestead law, but only under the coal land law, and, upon the evidence produced in the contest just mentioned, the Land Department found that the land now in question was known to be chiefly valuable for its deposits of coal and because of that finding rejected an application by the appellee to enter the land as a soldier's additional homestead and sustained an application by the appellant to purchase it as coal land. The appellee's application had been presented to the local land office on April 19, 1902, and, without allowance or rejection by that office, had been forwarded to the General Land Office at Washington for examination and consideration, as was required by an authoritative and long-existing regulation. As so presented and forwarded, the application was complete and perfect, in the sense that nothing remained to be done by the appellee to entitle him to a patent, unless it was incumbent upon him, under another regulation, to support the application by a showing that the land was not saline; that is, did not contain salt springs, or deposits of salt in any form, rendering it chiefly valuable therefor. The application was accompanied by a nonmineral affidavit, but not by a showing that the land was not saline. This omission, if it was such, was supplied after the hearing in the contest, but not be-

fore. In the meantime the appellant, alleging that the land was chiefly valuable for its deposits of coal, made application to purchase it under the coal land law, and this led to the contest and a full hearing therein, as a result of which it was found that the land was chiefly valuable for its deposits of coal and was known to be so when the contest was initiated. This finding was rested principally upon evidence of exploration of the land and discoveries of coal therein by the appellant subsequently to the presentation of the appellee's application and prior to the initiation of the contest; and, whilst the appellee objected to the consideration of this evidence, effect was given to it because the Commissioner of the General Land Office and the Secretary of the Interior were of opinion, as is disclosed by their decisions, that an authoritative regulation in force at the time of the appellee's application required him to support it by a showing that the land was not saline, that in the absence of such a showing his application was incomplete in the sense that he had not done all that he was required to do to entitle him to a patent, and that in consequence the character of the land was not to be determined solely by the conditions existing at the time the application was presented, but in the light of any subsequent exploration and discoveries which may have occurred while the application was still incomplete.

After these proceedings in the Land Department had resulted in the sale and patenting of the land to the appellant under the coal land law, the appellee by this suit sought to charge the appellant as a trustee and to obtain an enforced conveyance; the theory upon which the suit was brought being that the Land Department in considering and giving effect to the evidence of the subsequent exploration and discoveries committed a material error of law which resulted in the patenting of the land to the appellant when it should have been patented to the appellee. In the Circuit Court this theory prevailed, and the appellee obtained a decree which is challenged by this appeal.

The questions presented must be considered in the light of these well-settled rules relating to the administration and execution of the public land laws:

1. When a patent is issued by the officers of the Land Department, to whose supervision and control are intrusted the various proceedings incident to the disposal of the public lands, all reasonable presumptions are indulged in support of their action, and it is only when it is clear that some material error of law, imposition, or fraud has resulted in the issuance of a patent to one applicant when it should have been issued to another that the action of those officers successfully can be called in question and the patentee declared a trustee for the unsuccessful applicant and required to transfer the title to him.

2. To entitle an unsuccessful applicant to such relief, it is incumbent upon him affirmatively and clearly to show not merely that his claim to the land was older or better than that of the patentee, but that it was such a claim as in law should have been respected by the Land Department and, being respected, would have given him the patent.

3. When one becomes entitled to a patent, he is treated as the beneficial owner of the land, and the United States is regarded as holding the naked legal title in trust for him, and, if in this situation the Land

Department transfers the title to another, he takes it charged with the trust.

4. To entitle one to a patent it is essential, among other things, that he comply with all the requirements of the statute under which he seeks the title and the authoritative regulations of the Land Department thereunder.

5. When the right to a patent under such a law as the soldier's additional homestead law depends upon whether the land is agricultural or is known to be chiefly valuable for coal, that question must be determined according to the conditions existing at the time when the applicant complies with all the requirements of the statute and the authoritative regulations. If at that time the land is not known to be chiefly valuable for coal, he acquires a right to a patent which will not be disturbed by a subsequent change in the conditions; but, if before such compliance it is discovered that the land is thus valuable for coal, nothing that he subsequently may do will give him a right to a patent, because land known to be of that character is not subject to acquisition under such a law, but only under the coal land law.

The bill of complaint charges that at the time of presenting his application to the local land office the appellee fully complied with all the requirements of the law and the regulations of the Land Department relating to such applications, that he then lawfully secured an entry of the land and became its equitable owner, that there was no authoritative regulation requiring him to support his application by a showing that the land was not saline, that even if there was such a regulation the local land officers waived compliance therewith by not insisting thereon, and that the finding respecting the character of the land was not sustained by any substantial evidence. These allegations, it is insisted by the appellee, must be regarded as admitted, because in the Circuit Court the case was heard upon a general demurrer to the bill. But we think the allegations and the admission are materially restrained by what otherwise is disclosed by the bill and the exhibits which, in terms, are made part of it. The exhibits embrace copies of the proceedings in the Land Department, including the evidence in the contest, and it appears from them that the appellee did not support his application by a showing that the land was not saline, save as he did so after the hearing in the contest, that his application was not allowed or passed to entry, and that the evidence in the contest was such that the finding therein cannot be disturbed unless the character of the land was to be determined solely by the conditions existing at the time of the appellee's application.

On the part of the appellant it is said that in the contest the evidence of the conditions existing at the time of the appellee's application justified a finding that the land at that time was known to be chiefly valuable for coal, and with this as a premise it is argued that the action of the Land Department in considering and giving effect to the evidence of the subsequent exploration and discoveries properly may be disregarded. But as the Land Department's finding was silent respecting the known character of the land at the time of the appellee's application and was rested largely upon the evidence of the subsequent exploration and discoveries, it will be assumed, without so de-

ciding, that it is necessary to inquire whether this evidence rightly was considered and given effect.

The appellant insists that the action of the officers of the Land Department in respect of this evidence was right, even if the appellee had done all that he was required to do to entitle him to a patent, because his application had not been allowed or passed to entry. This insistence cannot prevail. It not only is opposed to the settled rule that the character of the land—whether agricultural or known to be chiefly valuable for coal—must be determined according to the conditions existing at the time when the applicant does all that he is required to do to entitle him to a patent, but is grounded in a misapprehension of the authority and duty of the officers of the Land Department in respect of such an application. Whilst it undoubtedly is subject to examination and consideration by them, this is not that they may elect whether or not they will consent to its allowance, but that they may ascertain whether or not the applicant has acquired a right to its allowance—a right which is acquired, if acquired at all, at that point of time when the applicant has done all that he is required to do in the premises instead of at the time of its recognition by them.

From what has been said it is evident that the principal question in the case is: Was it incumbent upon the appellee to support his application by a showing that the land was not saline? As has been seen, the Commissioner of the General Land Office and the Secretary of the Interior ruled that there was an authoritative regulation to that effect, and so answered the question in the affirmative. Of course, their ruling that there was such a regulation is entitled to great respect, particularly as it relates to a matter peculiarly within their knowledge, and yet it is not necessarily conclusive. Courts take judicial notice of the regulations of the Land Department and when required to pass upon the existence of a particular regulation, as when ascertaining any other fact of which they take judicial notice, may resort to any source of information which in its nature is calculated to be trustworthy and helpful, always seeking first for that which is most appropriate. Cosmos Co. v. Gray Eagle Co., 190 U. S. 301, 309, 23 Sup. Ct. 629, 47 L. Ed. 1064; Caha v. United States, 152 U. S. 211, 221, 14 Sup. Ct. 513, 38 L. Ed. 415; Jones v. United States, 137 U. S. 202, 216, 11 Sup. Ct. 80, 34 L. Ed. 691; Jenkins v. Collard, 145 U. S. 546, 560, 12 Sup. Ct. 868, 36 L. Ed. 812. Because of the appellee's insistent assertion that no regulation, such as that named in the decisions of the Commissioner and the Secretary, was in existence on April 19, 1902, the time when his application was presented at the local land office, we have secured copies of the records of the General Land Office bearing on that question and have considered them in the light of additional briefs which were submitted after the attention of counsel was directed to them. Plainly these records constitute a source of information which is not only trustworthy and helpful, but also the most appropriate in the circumstances.

A better appreciation will be had of the information so secured, if reference first be made to the antecedent situation. Colorado was one of the states in which the mineral land laws were in force and in which public lands known to be chiefly valuable for gold, silver, copper, coal,

or other minerals, not including salines, were subject to acquisition only under those laws. A regulation of the Land Department, which was coextensive with those laws and of long standing, required each applicant for an entry under any other land law to support his application by a showing that the character of the land sought to be entered was such that it was subject to acquisition under that law, and not under the mineral land laws; and among the forms prescribed by the Land Department for the use of applicants was a nonmineral affidavit embracing what was deemed a satisfactory showing under that regulation in the then state of the law. Whilst this was the situation, Congress enacted a statute whereby public lands "containing salt springs, or deposits of salt in any form, and chiefly valuable therefor," became subject to acquisition only under the mineral land laws. Act Jan. 31, 1901, 31 Stat. 745, c. 186 (U. S. Comp. St. 1901, p. 1435).

Coming now to the records before mentioned, the facts disclosed by them are these:

On November 14, 1901, following the enactment of the saline land act, the Commissioner of the General Land Office wrote to the Secretary of the Interior a letter, which, after referring to the change wrought by that act, proceeded as follows:

"I am of the opinion that it would be best to amend nonmineral affidavit (form 4-062) by inserting after the word 'deposit' the second time it occurs therein, the following words: 'That the land contains no salt springs, or deposits of salt in any form, sufficient to render it chiefly valuable therefor.' And I have the honor to submit herewith a form of affidavit so amended and to recommend that the same receive your approval and that I be authorized to substitute it for the form now in use."

On the same day of Secretary answered, saying (31 Land Dec. 130):

"The Department is in receipt of your communication of * * * November 14, 1901, * * * recommending that said regular nonmineral affidavit be amended by inserting therein, at the proper place, the words: 'That the land contains no salt springs, or deposits of salt in any form, sufficient to render it chiefly valuable therefor.' * * * Your recommendation * * * is * * * approved, and you are authorized to make such amendment and to require the amendment to be used in all future nonmineral entries in states and territories where the general mining laws are applicable."

Five days thereafter the Commissioner sent to the officers of each of the several local land offices in the states and territories in which the mineral land laws were in force the following circular letter:

"Under departmental instructions of November 14, 1901, nonmineral affidavit is required in all states and territories to which the general mining laws are applicable, said nonmineral affidavit having been changed by adding thereto, after the word 'deposit' in the thirteenth line of the body of the affidavit, the following: 'That the land contains no salt spring, or deposits of salt in any form, sufficient to render it chiefly valuable therefor.' This will govern all future applications. Copy of form, as approved by the Department, will follow."

By the Commissioner's direction, the new form of affidavit was then printed and a supply thereof forwarded to each of such local land offices for the use of applicants. Just when the circular letter and the newly printed form of affidavit were received at the Glenwood Springs, Colo., land office, at which the appellee's application was presented, does not appear, but photographic copies of other applications pre-

sented at that office in December, 1901, and January, 1902, and then forwarded to the General Land Office, show the interlineation of the nonsaline clause in the old printed form of affidavit at the place designated in the circular letter and also the use of the newly printed form, so it is a necessary inference that both the letter and the newly printed form of affidavit were received at the Glenwood Springs office three or four months before April 19, 1902, the time when the appellee's application was presented.

These facts make it plain that the change in the prescribed form of nonmineral affidavit was made by the Commissioner with the approval of the Secretary, that the circular letter of the former was issued with the approval of the latter, and that appropriate publicity was given to what was so done. Wolsey v. Chapman, 101 U. S. 755, 770, 25 L. Ed. 915. And this being so, it does not admit of any doubt that at the time of the appellee's application there was a regulation making it incumbent upon him to support his application by a showing that the land was not saline. True, the Secretary's approval was not written upon the circular letter, but no particular form of approval was required, and so the antecedent authorization so plainly expressed in the Secretary's letter was sufficient. Wolsey v. Chapman, supra; Wood v. Beach, 156 U. S. 548, 550, 15 Sup. Ct. 410, 39 L. Ed. 528; In re Brodie, 63 C. C. A. 419, 128 Fed. 665.

The power of those officers under the law to adopt such a regulation is not reasonably open to question. Although powerless to adopt a regulation which is in any wise inconsistent with or repugnant to the public land laws, they possess ample power to enforce, by appropriate regulations, every part of those laws, as to which it is not otherwise specially provided. Williamson v. United States, 207 U. S. 425, 462, 52 L. Ed. 278; [1] Cosmos Co. v. Gray Eagle Co., 190 U. S. 301, 309, 23 Sup. Ct. 692, 47 L. Ed. 1064; United States v. Bailey, 9 Pet. 238, 254, 9 L. Ed. 113; United States v. Macdaniel, 7 Pet. 1, 14, 8 L. Ed. 587. The newly enacted saline land act in effect prohibited the acquisition of public lands chiefly valuable for salines under any law other than the mineral land laws, and neither it nor any other law designated any particular means by which this prohibition was to be enforced. Thus the selection of some appropriate means devolved upon the Commissioner, subject to the Secretary's approval. Rev. St. §§ 441, 453, 2478 (U. S. Comp. St. 1901, pp. 253, 257, 1586); Bishop of Nesqually v. Gibbon, 158 U. S. 155, 166, 15 Sup. Ct. 779, 39 L. Ed. 931. Neither those officers nor their subordinates could be expected to have a personal knowledge of what public lands were chiefly valuable for salines, and little or no information of value on the subject would be afforded by the records in their custody. See United States v. Minor, 114 U. S. 233, 240, 5 Sup. Ct. 836, 29 L. Ed. 110; Barden v. Northern Pacific R. R. Co., 154 U. S. 288, 320, 14 Sup. Ct. 1030, 38 L. Ed. 992; Kern Oil Co. v. Clarke, 30 Land Dec. 550, 566; Gray Eagle Co. v. Clarke, Id. 570, 580. Then, of all persons, none so reasonably could be expected to be well informed respecting a particular tract of public land as one who, having selected it from among others, makes application therefor under the land laws. In this situation the Commissioner, with the Secretary's approval, adopted the regulation in question, and in

[1] 28 Sup. Ct. 163.

doing so merely applied to a new situation a general requirement, running through all the regulations of the Land Department, to the effect that applicants for public land must show that the character of the land applied for is such that their applications lawfully may be allowed. These considerations sufficiently indicate that the regulation is not inappropriate or unreasonable.

In urging its invalidity the appellee places some reliance upon section 2290 of the Revised Statutes, as amended by Act March 3, 1891, 26 Stat. 1097, c. 561, § 5 (U. S. Comp. St. 1901, p. 1389), which declares that applicants under the general homestead law, who comply with certain enumerated conditions, which do not include a showing respecting the character of the land applied for, "shall be permitted to enter the amount of land specified"; the argument presented in this connection being that the legislative enumeration of particular conditions is an implied prohibition against the imposition of others by executive regulation. We think the argument must fail, and for these reasons: Section 2290 does not say that, upon compliance with the enumerated conditions, the applicant shall be permitted to enter the land applied for, but only that he shall be permitted to enter "the amount of land specified," meaning the number of acres named in the preceding section. The prohibition against the acquisition of mineral, coal, and saline lands under the homestead law does not arise from anything contained in that law, but from provisions in the mineral, coal, and saline land laws, which take precedence over and qualify the homestead law in that regard. Section 2290 is a part of the general homestead law and relates to the enforcement of its restrictive provisions, but not to the enforcement of the prohibitive or qualifying provisions of the mineral, coal, and saline land laws. As to the latter, the means of enforcement are not specially prescribed by statute, and so may be designated by executive regulation under sections 441, 453, and 2478 of the Revised Statutes, which empower the Commissioner, under the direction of the Secretary, to enforce, " by appropriate regulations," every part of the public land laws, as to which it is not otherwise specially provided.

The old form of nonmineral affidavit contained a declaration that the land applied for was not known to be valuable for gold, silver, cinnabar, lead, tin, copper, coal "or other valuable mineral deposit," and also a declaration that the land was "essentially nonmineral," and because of this it is said that there was no occasion for the use of the nonsaline clause as required by the new regulation. Of course, it must be conceded that the words "mineral deposit" and "mineral" in their larger signification embrace salines, and also that by the enactment of the saline land act public lands chiefly valuable for salines became in legal contemplation mineral lands. But does it follow that applicants would have regarded the old form of affidavit as embracing salines? The words "mineral deposit" and "mineral" are variously used; sometimes with the larger signification just mentioned and at other times in a more restricted sense. In the nomenclature of public land proceedings they generally were used in a sense which excluded salines, because saline lands had not been subject to disposal under the mineral land laws, as was attested by several decisions in the Land De-

partment to the effect that such lands could not be acquired under those laws as either lode claims or placer claims. And whilst the law in this regard was changed by the saline land act, it was far from certain that this change was widely known or fully understood. In these circumstances, we think there was reason to apprehend that applicants would regard the old form of affidavit as not embracing salines. At all events, the Commissioner and the Secretary reached the conclusion that there was occasion to require an express showing in respect of salines, and we cannot say that their conclusion was wrong.

It next is urged that in this instance compliance with the regulation was not necessary, because when the land was surveyed it was noted upon the surveyor's return as being agricultural in character, and not saline. Passing the fact that the surveyor's return, which was made 14 years before the appellee's application, would afford no information in respect of intervening discoveries, we think the contention is foreclosed by the decision in Barden v. Northern Pacific R. R. Co., 154 U. S. 288, 320, 14 Sup. Ct. 1030, where it was said:

"Some weight is sought to be given by counsel of the plaintiff to the allegation that the lands in controversy are included in the section which was surveyed in 1868 and a plat thereof filed by the surveyor in the local land office in September of that year, from which it is asserted that the character of the land was ascertained and determined, and reported to be agricultural and not mineral. But the conclusive answer to such alleged determination and report is that the matters to which they relate were not left to the surveyor general. Neither he nor any of his subordinates was authorized to determine finally the character of any lands granted or make any binding report thereon. Information of the character of all lands surveyed is required of surveying officers, so far as knowledge respecting them is obtained in the course of their duties; but they are not clothed with authority to especially examine as to these matters outside of their other duties, or determine them; nor does their report have any binding force. It is simply an addition made to the general information obtained from different sources on the subject."

Of the contention that the local land officers waived compliance with the regulation by not insisting thereon it is enough to observe: First, that those officers were not charged with the duty of passing upon applications for entries under the soldier's additional homestead law, but were required to forward them to the General Land Office for examination and consideration, so a waiver cannot be predicated upon their action; and, second, that had they been charged with the duty of passing upon such applications, they could not have waived compliance with the regulation, because it had the force of law and was no less binding upon them than upon applicants.

We conclude that the evidence in question rightly was considered and given effect and, therefore, that the case made by the bill and its exhibits was not one which entitled the appellee to relief.

The decree is, accordingly, reversed, with a direction to sustain the demurrer to the bill.